O6-1200 Thank you, Your Honor. May it please the court, counsel, in reviewing this record in the case, as incomplete as it sort of is, but in reviewing the record, I think one has struck on sort of an intestinal level that these defendants knew full well and had every reason to reasonably anticipate that they would be hailed into court in Illinois over this conduct. I realize I'm kind of starting with this reasonableness, but when I'm thinking about fairness, fair play, substantial justice, it does hit one on sort of an intestinal level. And I think the defendants know it. They know it from their substantial history and contacts in the state of Illinois that go back to 1986, and they show it in their various, what I consider sort of defensive and off-the-mark and conflicting responses regarding their most recent contacts, focusing on 2004 and 2005. So if I can go back for a moment to sort of the traditional analysis and the historical contacts here, KFP entered into with our clients no less than nine contracts, the earliest in 1986, the last one in 2001, all in the state of Illinois, all in which they agreed that the choice of law in the forum, the cases would be heard if there were disputes. If there were disputes in the state of Illinois, seven of those contracts in which they agreed that the appropriate federal court would be the forum for hearing their matters. Two, they agreed it would be the state court of Illinois. For them to suggest that somehow if they're going to engage in conduct that it's going to infringe upon products with the plaintiff with whom they've had this relationship over the years would be somehow unfair seems most unreasonable. When we get to some of the specifics in this case, since we don't decide cases based on intestinal feelings, is there evidence in the record to show that Al Parpeet was an agent? The only evidence we have of that is the letter by clerk's agent, Holland Pack, inviting, which we believe went to customers, business people in Illinois, inviting them to three trade shows in Ohio, in Michigan, and in Illinois that were going to be taking place at various times in January of 2005, in which it was stated that Al Parpeet would be showing these products. It's one of those areas where it would seem that the court's denial of our request for discovery was ill placed because it's an area I think that is worth exploring and we ought to know. In other words, the answer to my question is there is not evidence in the record that establishes that Al Parpeet was an agent. Other than that letter.  Which letter are you referring to? The letter at appendix page 414? Yes. Which, from what we can tell from this record, appears to be part of a letter. And the only reason I say that is because there's no to whom, there's no address, there's not what you would typically see in a letter. And it sort of ends in the middle with, you get the impression this is a longer letter. We don't have that. There was no discovery. We don't know other than what we see here. But yes, Your Honor, that is the letter to which I refer, page 414 in the joint appendix. You know, it struck me in reading this that the strongest case you have on an offer to sell is that letter that was not permitted to be supplement, the record wasn't supplement. And if you read through all the cases the Federal Circuit has come out with, what is an offer to sell, the trade show thing probably isn't one. And it may have been generating interest, but it wasn't an offer to sell. And the letter that came in three months after you initiated suit probably would meet the Federal Circuit standards. And so it seemed to me this case rises and falls on Beverly Farms. In other words, whether or not this was a continuing tort and that was close enough to the time of filing suit that it should have been part of the record. And I don't know if you see it that way. I don't necessarily see it as the strongest point here, but I appreciate that. And I'm sensitive to really the response of the affilee that that's a manufactured contact, if you will. I don't believe it is. In the sense of, it's not like the other case we read where it's the wife of the person who does it, or it's the paralegal that sort of lures somebody into sending something into the jurisdiction. We know from past history that they were contacting people in Illinois from the letters and admissions they've made, which are murky. Six letters, seven letters, five or six letters, one letter, two letters. The records are very conflicting with what they admit to having sent to whom. I think that needs to be explored. But besides that, I think in this case, this was a show in Ohio in which Paul Riley, a representative of the plaintiff, was there. These are shows that people attend nationwide. And he visits with John de Klerk, who is some representative of Hollenpack. Not Jan de Klerk, who is his father, and who declares himself to be the sole employee, the sole everything with Hollenpack. But he meets with John. And there's discussion about the Tyler System and the Tyler Sleeve and so forth. As a response to that visit, he is then thanked in the letter, which is page 782 of the joint appendix. He thanks you for your interest in the two shows in Ohio, the short course and the super floral show. And it does include the price quote and the descriptions, which are contained on page 784. My concern is, if that's the only offer to sell, and I believe in the record that is the only offer to sell, I think the court should have allowed us to supplement the record. Because I think under Beverly it does relate back to what was happening at the time we filed the suit in April. Because we know in January there's the trade shows. We know from historical letters the year before the letters they wrote, there's going to be these shows in Ohio again in July. And we know from the record, page 806, that after we filed the infringement action, clerks in Holland wrote Holland Pack in Holland. And Peter Melson wrote, essentially, Jan de Klerk, JM de Klerk, and told him, requested they stop all sales of the products and all related sales activities in the USA. So getting back to this point about the continuous infringement, we know despite this going on, the trade show in January. Do you agree that could not be an offer to sell, just an invitation to a trade show, that in and of itself? Well, without knowing what, yes, that in and of itself, but I think it begs the question, what took place at those trade shows? Who were invited there? Who came there? Were these businesses from Illinois? Were these reasonably businesses from Illinois? Did they follow up with letters like they did here? It invites the question, if they wrote to Mr. Riley, who presents himself as a representative of the plaintiff, whom they've known for 20 years, the plaintiff. There's no luring in the sense of I present myself as somebody else trying to buy your product. No, I'm the plaintiff. I'm here. I'm looking at your tile or sleeve. Tell me about this. Show me, and so forth. And then they follow up and send it to Mr. Riley, literally six weeks or two weeks later. It begs, who else did they send such invitations to? Who else attended the show that may have been Illinois customers that they may have sent similar price letters, quotations, and, if you will, offers to sell? So it seems that here, and also in your reply brief, where you, for the first time, as I understand it, asked for an alternative remedy, which is a remand. You raised the issue about, well, maybe we do need more discovery to establish our personal jurisdiction. So let's send it back as an alternative remand. Am I misunderstanding something? Well, perhaps I'm misunderstanding it. At the trial court, as part of our response, we asked for discovery. Right. And that was denied. Well, here's my concern or question, so maybe you can respond. Sure. In your first brief, in your blue brief, as I read it and understand it, you were asking exclusively for a reversal. You were saying that on this record, the judge was wrong and ought to be reversed. And then in the gray brief, as I see it, for the first time, there's suddenly this whole other issue, which in my view is a different issue, about whether it ought to be remanded. In other words, whether, I guess, the court erred in denying your request for discovery. I assume you're not saying you can put in new discovery requests. This would be a denial of the previous discovery request. Correct. Is that allowed? I mean, the other side has their red brief responding to your request for reversal and your argument on the merits and not really an argument with respect to discovery. So why should we consider your new request? Because we didn't make it in the brief in the chief, if you will. I mean, I think this court has the inherent authority to sort of follow the law and do what's appropriate, and I think that is an appropriate remedy here. It was asked for in the trial court. But isn't our precedent clear that absent some unusual circumstance that failure to raise the point in your principal brief waives the issue? Yes. All right. You're into your rebuttal. You'd like to save that time? Well, I would like to say briefly that I will sit down and save some time for rebuttal. And again, I don't want to go back to the intestinal level, but I think the court should consider the 4K2 argument. And there's going to be a problem that that wasn't raised at the trial level, although, of course, personal jurisdiction was. And I say that with a fear that it's like you might view that we're throwing everything against the wall in the hope that something sticks. But the reality is we believe that there is substantial, systematic and continuous context for general. There's the stream of commerce and offers to sell that could be explored certainly and demonstrated more clearly. For specific jurisdiction. But if the defendant is correct, I believe 4K2 ought to get us jurisdiction and it should be reversed for that reason. Thank you. Thank you. We'll reserve the balance of your time. Mr. Adams? Thank you, Your Honor. Your Honor, I would like to address the point about the request for discovery, not to deal with the issue related to whether it was raised in the principal brief, but if we look at the record below on page 433, it really was not a request for discovery. It was a request for an advisory opinion from the court. The specific request was for the discovery to be made On the basis of the documentary evidence submitted herewith, Primatech submits the existing record is sufficient to justify a denial of defendant's motion. However, in the event this court deems that the existing record is not sufficient for that purpose, Primatech requests that it be allowed to conduct discovery. So I would say that in any trial and in any case, I would like to ask the judge to express an opinion in advance before I conduct discovery so that we can narrow the issues. But I believe that the appropriate method for addressing that issue is to file a motion, and that was not done. But why wasn't a prima facie case put forward enough to trigger discovery? I understand that the procedural issue was properly raised in the main brief or not, but normally in the trial court, if you put together enough to think that there may be a continuous tort, whether it's trade shows or this offer letter, why isn't that enough at least to get you some discovery as to whether or not you're making offers for sale? I think that it is, Your Honor. And my point was that no request was made. And maybe I'm splitting a fine hair here, but they did not file a motion requesting discovery. They said, we're prepared to submit this case on the existing evidence. We only want discovery if you're going to rule against us. That's common, right? Alternative theories, you probably have done it. People do that. If I can't win the whole hog, I'd at least like the discovery based on what I've got. Well, respectfully, Your Honor, I disagree with you. I think that if you want discovery, you need to ask for it. And they could have asked for it and didn't. They only asked for it in the event that they were going to lose. And when we talk about discovery and when we're concerned, of course we're bound here by the record, but when we're concerned about all of the other facts that might exist in this universe, I'd like all of you to consider the circumstances under which this case arises. And that is that my client, Clark's Flexible Packaging, not Hollenbeck, but Clark's Flexible Packaging, had been a defendant in a contempt proceeding during which three and a half years of discovery was conducted, 28 depositions were taken, 56,000 pages of documents were produced, and the record that we have before this court about the contacts with the state of Illinois are what they are. So to assume that there's a whole universe of additional information is a dangerous assumption. The letters in the record, except for the letter, the second letter in the supplemental record, the letters that are in the record about the contacts of our clients with Illinois were put in the record by us, not by the plaintiff. So to suggest we were not being candid with the facts I think is also very dangerous. We were not trying to hide the ball in any way whatsoever. The plaintiff attended both of the trade shows in Ohio in which they contend they witnessed the alleged infringing product being offered for sale. The plaintiff attended these trade shows. So if there was evidence that arose out of those trade shows about contact with people in Illinois, these people are all in the same business, which is to supply floral packaging to greenhouses and the like. We're led to believe that the plaintiff had no ability to gather that evidence for this case. Was there a trade show in Chicago that was some reference to it? That's in the Al Parpeet letter that you pointed out, and I can't remember which page of the exhibit, but the Al Parpeet letter. 414. Yeah, that was Mr. DeClerk's letter, I believe, saying that there was going to be a trade show in Chicago. We don't have any evidence in the record that this product appeared in that trade show. So that was a letter inviting people to a future trade show to come. Well, did it happen? I don't know. Well, wouldn't that be something discovery would show? Discovery might show that, but the question here is whether we're to forgive the plaintiff and put the defendants at a substantial additional burden of going back to a trial court when the plaintiff had an opportunity to request that discovery and get it before the court. And it's not in the record, but I'll bet the plaintiff was at that trade show. So my belief is that if the evidence was there that this product was shown at that trade show, and I don't know, I'm not making a representation to the court whether it was or whether it wasn't, but if it was, undoubtedly the plaintiff would have brought it to the court's attention. When was the trade show? Did it predate the filing of this? I believe that's correct. I believe that's correct, Your Honor. I believe it was January of 2005. You have to infer that from the context of the letter, but I believe that the letter indicates that it was January of 2005, and that was a letter that we had attached to the affidavit which was filed in response to the answer. So, again, you have to infer that from the context of the letter. Would you agree that supplemental letter, if it were to be permitted, would be an offer for sale? I wouldn't. And, of course, the Federal Circuit has at least four or five cases that go through that issue in quite a bit of detail. And under the 3D systems case, we know that when there's specifications and a price quotation combined with samples, that in that case it amounted to an offer for sale. There's some discussion in subsequent opinions as to whether or not 3D, not necessarily subsequent opinions of this court, but of other courts, like the District of Massachusetts, has a lengthy opinion about whether 3D systems is even the current law. If we look at the subsequent Federal Circuit's opinions, like Rotec and the MEMC case, some of which, granted, go to the on-sale bar as opposed to infringement, but as the later cases seem to merge that analysis and they seem to reject 3D systems' statement that you don't consider the authority for the on-sale bar, but all those cases say you have to look at traditional principles of contract law to determine whether an offer of sale was made, meaning that there must be a manifestation of an intention to be bound. And I'm trying to remember, I believe it's the Moldflow opinion from the District of Massachusetts that says, in effect, that there has to be something that can be accepted by the words, I accept. What we have in that second subsequent letter is, in fact, it's on the bottom of the first page. It said, I'll be happy to send you a price quotation. But what's included in that letter is a price list. There's not a quote for sale. There are not the terms that the District Court in Massachusetts held that you would have to subsequently negotiate if you had a price list. In the Moldflow case, there was a price list included in the letter and the court in that case granted that. It's not the Federal Circuit, but the court in that case found that that was not sufficient to constitute an offer for sale under those circumstances. I'm not aware of any Federal Circuit case in which pricing was included except the 3D systems case and the opinion in the 3D systems case does not provide sufficient detail for any of us, at least for me, to determine what the court meant when it said a price quotation. The 3D systems case involved a substantial piece of machinery and in every situation in which I've been involved in a client that quotes a substantial piece of machinery, a price quotation is a multi-page document which contains all of the terms of sale. Now, we don't know that. I don't want to mislead the court. We don't know that from the 3D systems opinion. But these are just sleeves. They're not whole machines. They're just the plastic things, right? But it depends on how many you want to buy and what you want your terms of sale to be. They are just sleeves. They are just plastic things. There's no question about it. Your Honor, we believe that the stream of commerce cases do not apply because there is no evidence that these products were ever sold into Illinois. So I think that the stream of commerce cases are taken out and that it comes down to then whether there is evidence in the record of an offer of sale being made in Illinois. And I don't believe that the second letter amounts to that. And I don't believe, more importantly, that the district court abused its discretion in refusing to consider that evidence. There are two standards of review before this court, de novo for personal jurisdiction, but it's abuse of discretion under the West Vaco opinion as to whether or not the court should have considered the supplemental evidence. There are many reasons why the court didn't want to consider it. The district court didn't believe it went to the conduct at the time of the filing of the complaint. In the Beverly Hills fan case, the initial evidence filed with the complaint or in response to the motion to dismiss it, I may be mistaken, but was the investigator's statement that I saw one fan in a store, in a builder's supply store, and the supplemental evidence was three days later, he had called the clerks at various stores and there were 52 fans on sale. And the quotation in that case that I believe is relevant, the court said that the evidence tended to show that contemporaneously with the filing of the complaint, defendants were engaged in continuous shipment of substantial numbers of the accused fan into Virginia. This second letter that is sent by Mr. DeClercq after the complaint is filed is, number one, not in his capacity as an agent. He's clearly gone contrary to the authority of his principle and that's undisputed in this case. So that doesn't supply evidence to support jurisdiction against clerks' flexible packaging and it doesn't support any indication that Mr. DeClercq was engaged in continuous shipments of these products into the state of Illinois. Well, you know, the thing that struck me is, ironically, the Beverly Farms timing was exactly the same as this timing. It was the letter came in, the supplementation three months after the filing of the complaint with something that predated it. Here would be the Chicago trade show. And the point of the Federal Circuit was that this is a continuous tort. And so it was arbitrary not to include it. So you're making the distinction that this was only one offer as opposed to 52 fans? Well, Anne, in addition to that, and the offer, we know that the offer in this case is subsequent to the filing of the complaint. What we don't know from Beverly Hills Fan is when those 52 fans made it to the store. The issue in Beverly Hills Fans was not that the evidence itself occurred after the filing of the complaint. We don't know when those 52 fans made it to the builder's supply store. The issue in that case was that the affidavit was signed as of a date. In other words, he called the clerks of those stores three months after the complaint was filed. It's undisputed in this case that this letter was sent after the complaint was filed. But maybe not after when the summonses were served. We don't know that, do we? I thought that was in the record. You have 90 days, right? All parties were served. I think this was after service, Judge, but I'd have to consult the record on that point. Going to Rule 4K2, in my brief time left, Your Honor, I think that the issue in Rule 4K2 is, first of all, what is the standard in this circuit? Because the circuits have different standards, right? You have the standard of the Seventh Circuit, which appears to impose an obligation on the defendant to consent to jurisdiction in another court, which seems to be a rather harsh standard. And then you have the continuum of that to the standard of the Fourth Circuit, which preserves the traditional burden of proof on the plaintiff to show personal jurisdiction. Regardless of the three elements of Rule 4K2, one of the elements has to be that the defendant is not subject to jurisdiction in a judicial district within the United States. And the plaintiff contends that the defendants are subject to jurisdiction in Illinois, which obviously we dispute and don't agree with. But the plaintiff had offered into evidence the affidavit of Donald Weider, the president of the plaintiff, who said he witnessed offers for sale being made in Ohio. Now, had the plaintiff below raised Rule 4K2, national context, as a possibility for jurisdiction, I believe that the record would have been more complete as to what occurred at the trade show. But right now on this record, we have Donald Weider's own statement that offers for sale were made in Ohio. And as I read this court's precedent, if that is indeed true, jurisdiction would exist in Ohio. I want to be very clear on this record. These defendants are not consenting to jurisdiction anywhere, and I have no authority to do that, but this circuit has not announced any sort of requirement that a defendant be placed in a Hobson's choice of standing on the merits and saying we're simply not subject to jurisdiction or consenting to jurisdiction in another judicial district. As to whether or not these defendants are subject to continuous and systematic contracts, it's undisputed in the record that all of Clark's flexible packaging contracts were terminated in June of 2002. A defendant should be able to extract itself from jurisdiction. These defendants want nothing other than to extract themselves from litigation with this plaintiff. That's all they want. They just want to be done. Thank you. Thank you very much. Mr. Lucco? Thank you. Well... On the 4K2 point, do you dispute that there would be jurisdiction in Ohio? And does that defeat that whole issue? There would be jurisdiction in Ohio based upon the declaration of Mr. Weider. Doesn't that defeat the 4K2 proposition? Perhaps. All right. I'm going to go back to the Al Parpeet letter and his question of agency and so forth. Because I think the letter has instructed a little bit about that relationship and why we should be able to explore it more. Because at the end of the letter, which is a young 414 yard, it says, for more information, price quotes and orders, you can contact Mr. Weider or you can contact Al Parpeet or Hollenpack. So they seem to be putting a relationship between Hollenpack and Al Parpeet in some fashion. If Al Parpeet was completely unrelated, someone who is not in some sort of an agency relationship with either Clarks or Hollenpack, you wouldn't think they would be doing this direction. You wouldn't think they would be inviting an either-or kind of response if you need price information or you need to place an order. It does seem to suggest these people are working together in some kind of a relationship that is mutually beneficial and our contention is that it works to the detriment of our client's rights. But in this letter, except for the reference to Al Parpeet going to a trade show in the future in Chicago, there's nothing else in this letter that connects it to Illinois, correct? Do we know who it was sent to? No, we don't. We do not know who received this letter from John DeClercq. That part is missing. It does say we're inviting him to three trade shows, one of which is January the 19th through the 21st in Chicago. And it says that Al Parpeet will be doing the demonstrations of the Tyler system, which is what Mr. Wader believes he saw at the Ohio show in 2004, the summer of 2004. What about the counterpoint that if it had happened, you would have known about it and you didn't put it into the record? Well, I don't think there's any evidence whatsoever that any representative of ours was at this particular trade show. I see. Maybe we both should know that, but the flip side seems to be that they ought to know whether they were there or not. They're inviting people to be there to see this. Surely, Holland Pack and DeClercq's knows whether these things were demonstrated there, whether orders were placed there, what materials were utilized, who attended it, and so forth. It's one of those positions in the brief where they say there's no proof that we attended or that the products were even at that trade show. It would have been awfully easy to simply say there were no products at the trade show. We didn't attend the trade show. It's one of those areas where they say in the brief in the jurisdiction of Stream of Commerce that on page 38 of their brief that the Tyler Sleeves may have been sold in the U.S. Well, there's a testimony of Mr. DeClercq himself on March 18th of 2005 that the Tyler Sleeves were being sold in the U.S. We have the other letters there. There's the letter that talks about intensifying the efforts, which has already been referenced here in the 413 letter. We have the letter from Nelson after the filing of the lawsuit that says stop the sales. So it seems fairly clear that the Tyler Sleeves it's not a question of whether they may be sold in the United States. The Tyler Sleeves were being sold. We just don't know the extent and all the jurisdictions in which they were being sold. I think we could reasonably get that information. Thank you. Thank you very much. The case is submitted.